NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3746-20

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

DIEGO ARROYO-NUNEZ, a/k/a
DIEGO ARROYO, and DIEGO
NUNEZ,

     Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **January 18, 2022** |
| **APPELLATE DIVISION** |

Argued November 15, 2021 – Decided January 18, 2022

Before Judges Messano, Accurso and Rose.

On appeal from the Superior Court of New Jersey, Law
Division, Union County, Accusation No. 19-04-0265.

Claudia Joy Demitro, Assistant Attorney General,
argued the cause for appellants (Andrew J. Bruck,
Acting Attorney General, attorney for appellant State
of New Jersey; Jeremy Feigenbaum, State Solicitor,
Alec Schierenbeck, Deputy State Solicitor, and Claudia
Joy Demitro, of counsel and on the joint brief).

Joseph E. Krakora, Public Defender, attorney for
appellant Diego Arroyo-Nunez; (Alison Perrone, First
Assistant Deputy Public Defender, of counsel and on
the joint brief).

Joseph Paravecchia, Assistant Hunterdon County Prosecutor, argued the cause for amicus curiae County Prosecutors Association of New Jersey (Esther Suarez, President, County Prosecutors Association, Hudson County Prosecutor, attorney; Joseph Paravecchia, of counsel and on the brief).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey, attorneys; Alexander Shalom and Jeanne LoCicero, on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

This appeal comes to us in an unusual posture. The State of New Jersey and defendant Diego Arroyo-Nunez both appeal from the Law Division's August 24, 2021 order that denied appellants' joint motion to vacate the mandatory period of parole ineligibility portion of defendant's sentence. Appellants filed that motion pursuant to former Attorney General (AG) Gurbir Grewal's Law Enforcement Directive No. 2021-4, "Directive Revising Statewide Guidelines Concerning the Waiver of Mandatory Minimum Sentences in Non-Violent Drug Cases Pursuant to N.J.S.A. 2C:35-12," (April 19, 2021) (the Directive). The Directive anticipated joint motions filed by prosecutors and defense counsel would be cognizable pursuant to Rule 3:21-10(b)(3) (the Rule), which permits a court to enter an order "at any time . . . changing a sentence for good cause shown upon the joint application of the defendant and the prosecuting attorney."

A-3746-20

2

Defendant pled guilty on April 3, 2019, to an accusation charging him with first-degree distribution of five or more ounces of cocaine, N.J.S.A. 2C:35-5(b)(1). Pursuant to a negotiated plea bargain, the State agreed to dismiss all other pending charges and recommend a sentence not to exceed an eleven-year term of imprisonment with twenty-four months of parole ineligibility. At sentencing on June 7, 2019, the judge imposed a sentence in conformance with the agreement. Defendant never filed an appeal or a petition for post-conviction relief.

On June 28, 2021, pursuant to the Rule and the Directive, the State and defendant filed a joint motion to change defendant's sentence by vacating the period of parole ineligibility. Pursuant to the Supreme Court's earlier May 26, 2021 order and Notice to the Bar,[1] the joint motion, along with approximately six hundred applications filed jointly by the State and other defendants, was assigned to a specially designated judge.

On August 20, 2021, while the joint motion was pending, defendant was released on parole. Four days later, the judge denied the motion in an oral decision memorialized in writing. She concluded the Directive would

---

[1] See "Centralized Handling of Joint Motions to Reduce Mandatory Parole Ineligibility Terms." Both the Notice to the Bar and the order are available online at https://www.njcourts.gov/notices/2021/n210528a.pdf (last visited Dec. 28, 2021).

effectively "invalidate a statute," N.J.S.A. 2C:35-12 (Section 12), part of the Comprehensive Drug Reform Act of 1987 (the CDRA), N.J.S.A. 2C:35-1 to -36A-1, thereby invading the province of the Legislature contrary to the separation of powers doctrine. See N.J. Const. art. III, para. 1 ("The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others except as expressly provided in this Constitution."). This joint appeal followed.

Appellants urge us to reverse the order, arguing the judge mistakenly interpreted Section 12, resulting in an untenable restriction on the Directive's implementation that negatively affects hundreds of other defendants ostensibly eligible for reduction or elimination of the mandatory minimum aspect of their sentences. Amici American Civil Liberties Union of New Jersey (ACLU) and the County Prosecutors Association of New Jersey (CPA) also contend that reversal is warranted.

Having considered the arguments in light of the record and applicable legal principles, we agree the judge misinterpreted Section 12, as interpreted by the Court, and also failed to recognize subsequent amendments to the CDRA that reflect the Legislature's changing attitude toward the criminal prosecution of drug offenders, and its intention to ameliorate the more punitive aspects of

the CDRA on which the judge primarily focused. We therefore reverse the order under review. At the same time, we emphasize that whether any joint motion brought pursuant to the Directive and Rule 3:21-10(b)(3) demonstrates "good cause" for sentence modification is solely for the court to decide.

I.

We start by examining the genesis of the Directive and its specific provisions that require county prosecutors to make joint applications with defendants for sentence modifications in certain cases.

The Criminal Sentencing and Disposition Commission (the Commission)

The Legislature created the Commission in 2009. See L. 2009, c. 81; N.J.S.A. 2C:48A-1 to -4. The statute provides: "[I]t shall be the duty of the [C]ommission to conduct a thorough review of the criminal sentencing provisions of New Jersey law for consideration of possible recommendations for revisions to the laws governing the criminal justice system." N.J.S.A. 2C:48A-2(a). These recommendations were intended to "provid[e] a rational, just and proportionate sentencing scheme that achieves to the greatest extent possible public safety, offender accountability, crime reduction and prevention, and offender rehabilitation[,] while promoting the efficient use of the State's resources" and also "consider[ing] issues regarding disparity in the criminal justice process." Ibid. The Commission was not constituted and did not meet

until 2018; it issued its first report in November 2019. New Jersey Criminal Sentencing and Disposition Commission, <u>Annual Report</u> (Nov. 2019) (<u>Commission Report</u>).[2]

The Commission found there was a "consistent increase in the percentage of people sentenced to mandatory minimum terms" in our State, along with "fundamentally inequitable racial and ethnic disparities" in our prison populations. <u>Id.</u> at 19. To address these concerns, the Commission issued "proposals [that] w[ould] result in meaningful sentence reductions for a large number of state inmates who are highly unlikely to pose a risk to public safety." <u>Id.</u> at 21. The Commission unanimously endorsed nine recommendations, including the following four:

1. Eliminate mandatory minimum sentences for non-violent drug crimes.

2. Eliminate mandatory minimum sentences for non-violent property crimes.

3. Reduce the mandatory minimum sentence for two crimes — second[-]degree robbery and second[-]degree burglary — that previously have been subject to penalties associated with far more serious offenses.

4. Apply Recommendations #1, #2, and #3 retroactively so that current inmates may seek early release.

---

[2] Available at https://www.njleg.state.nj.us/legislativepub/reports/CSDC _2019_Annual_Report1114C2.pdf (last visited Dec. 28, 2021).

[See id. at 21–34.]

We focus primarily on Recommendations #1 and #4.

The Commission urged elimination of mandatory minimum parole ineligibility terms for the following seven "non-violent drug crimes":

1. N.J.S.A. 2C:35-3:  Leader of narcotics trafficking network

2. N.J.S.A. 2C:35-4:  Maintaining or operating a CDS production facility

3. N.J.S.A. 2C:35-5:  Manufacturing, distributing, or dispensing CDS

4. N.J.S.A. 2C:35-6:  Employing a juvenile in a drug distribution scheme

5. N.J.S.A. 2C:35-7:  Distributing, dispensing, or possessing CDS within 1000 feet of a school

6. N.J.S.A. 2C:35-8:  Distribution of CDS to persons under age 18

7. N.J.S.A. 2C:43-6(f):  Recidivist CDS offenders[3]

[Commission Report at 22.]

All but one of these provisions were part of the CDRA when enacted.[4]

---

[3] With respect to N.J.S.A. 2C:43-6(f), the Commission recommended retaining enhanced penalties for recidivist offenders, including mandatory extended terms, but not mandatory periods of parole ineligibility.  Commission Report at 22.

[4]  N.J.S.A. 2C:35-7 was enacted simultaneously with the CDRA, but was a separate chapter of the session laws.

The Commission explained the CDRA had "fundamentally shifted the sentencing paradigm undergirding Title 2C by providing judges with no sentencing recourse from the imposition of mandatory minimum sentences, regardless of the circumstances of the offense, the culpability of the offender, or the length of the applicable mandatory minimum term." Commission Report at 15. With respect to Recommendation #4, the Commission recommended the Legislature "creat[e] a mechanism to ensure that" the amendments to the mandatory minimum parole ineligibility terms discussed in Recommendations #1, 2, and 3 "apply retroactively to inmates currently incarcerated." Id. at 24.

Recognizing that "inmates' Judgments of Conviction w[ould] need to be modified by judicial order, the Commission recommend[ed] a [thirty]-day window before these modifications became effective, which would provide an opportunity for the State to file a notice of objection," providing that, if no objection were filed, "then all eligible inmates [would] receive retroactive relief." Id. at 24. The Commission recommended that those inmates receiving retroactive relief "would be resentenced as if they had not been subject to a mandatory minimum term . . . . As a result, these inmates would be subject to the default period of parole ineligibility of [thirty-three] percent."[5] Id. at 25.

---

[5]  See N.J.S.A. 30:4-123.51(a) ("Each adult inmate sentenced to a term of incarceration . . . shall become primarily eligible for parole after having served

The Commission further "recommend[ed] that the Attorney General exercise his authority to oversee the filing of any notices of objection and promulgate statewide guidelines to direct prosecutorial decision making in such filings." Id. at 24–25.

The Legislature introduced several bills designed to implement many of the Commission's recommendations. We need not trace the complicated legislative history of those various measures; it suffices for our purposes to say that the Legislature has failed, or the Governor has vetoed the Legislature's efforts to date, to enact Recommendations #1, #2, #3, and #4, the latter referring to the Commission's framework for retroactively modifying extant sentences.

The Directive

The AG issued the Directive on April 19, 2021, the same day Governor Murphy vetoed S. 3456 (2021). See Governor's Conditional Veto Statement to S. 3456 (April 19, 2021) (noting the bill would eliminate mandatory minimum sentences for elected officials convicted of official misconduct and went "far beyond the Commission's recommendations").

---

any judicial or statutory mandatory minimum term, or one-third of the sentence imposed where no mandatory minimum term has been imposed less commutation time for good behavior . . . and credits for diligent application to work and other institutional assignments . . . .").

The Directive seeks to implement Recommendation #1 "to end the imposition of mandatory parole ineligibility for [non-violent drug] crimes," and Recommendation #4, by "creat[ing] a mechanism to retroactively modify the sentences of individuals currently incarcerated under mandatory minimum terms." Directive at 4. To effectuate Recommendation #1, the Directive "instructs prosecutors statewide to use <u>existing statutory authority to waive the imposition of . . . mandatory minimum sentences</u>" with respect to the seven drug offenses for which the Commission recommended elimination of mandatory minimum terms. <u>Id.</u> at 1–2 (emphasis added). The AG noted, "These drug crimes differ from the State's other mandatory minimum offenses in one key respect," i.e., "the period of mandatory parole ineligibility can be waived pursuant to a 'negotiated agreement' between the defendant and the State." <u>Id.</u> at 2.

The "existing statutory authority" cited by the AG is Section 12, which provides:

> Whenever an offense defined in this chapter specifies a mandatory sentence of imprisonment which includes a minimum term during which the defendant shall be ineligible for parole . . . the court upon conviction shall impose the mandatory sentence . . . unless the defendant has pleaded guilty pursuant to a negotiated agreement or, in cases resulting in trial, <u>the defendant and the prosecution have entered into a post-conviction agreement, which provides for a lesser sentence, [or] period of parole ineligibility . . . . The negotiated plea</u>

> or post-conviction agreement may provide for a specified term of imprisonment . . . , a specified period of parole ineligibility . . . or other disposition. In that event, the court at sentencing shall not impose a lesser term of imprisonment, [or] lesser period of parole ineligibility . . . than that expressly provided for under the terms of the plea or post-conviction agreement.
>
> [N.J.S.A. 2C:35-12 (emphasis added).]

Section 12 both "limits judicial discretion over sentencing," while also "substantially expanding prosecutorial discretion in drug prosecution plea agreements." State v. Courtney, 243 N.J. 77, 86–87 (2020). And, as the Commission observed, Section 12's delegation of sentencing power to prosecutors led to "recurring litigation about the constitutionality of . . . the CDRA's provisions." Commission Report at 15–16. We discuss that "recurring litigation" below.

The Directive guides the exercise of prosecutorial discretion under Section 12 at four points — (1) the extension of plea offers; (2) post-trial agreements; (3) violations of probation; and (4) joint applications for sentence modification — by "establish[ing] statewide rules that require prosecutors to seek the waiver of mandatory parole disqualifiers for non-violent drug crimes" at each point to "achieve to the greatest extent possible . . . the Commission's recommendation to eliminate . . . mandatory minimum sentences for non-violent drug crimes." Id. at 5. We focus only on the issue before us — joint applications

to modify sentences already imposed on those defendants convicted of the enumerated offenses under Chapter 35 of the New Jersey Criminal Code.

The AG chose the Rule as the means to this end, and the Directive instructs prosecutors to "agree to file a joint motion to . . . to rescind a mandatory period of parole ineligibility for a Chapter 35 offense" whenever an incarcerated defendant requests the prosecutor to do so. Directive at 8. The defendant must be "[c]urrently serving a sentence for a qualifying Chapter 35 offense that includes a mandatory period of parole ineligibility . . . and . . . ineligible for parole solely on account of the parole disqualifier." Ibid. When filing a joint motion, the prosecutor "shall state that good cause for the modification exists as a result of" the Commission's "recommendation in favor of retroactive modification of mandatory periods of parole ineligibility imposed for qualifying Chapter 35 offenses . . . ." Id. at 9. Additionally, given the Directive's requirement to "waive mandatory periods of parole ineligibility for all current and future defendants pursuant to Section 12," good cause for filing a joint motion was established by "[t]he need to ensure sentencing uniformity for defendants convicted of qualifying Chapter 35 offenses." Id. at 10. Through these joint motions, the parties would seek modification of a defendant's sentence by reducing the period of parole ineligibility from the mandatory minimum imposed for the Chapter 35 offense to the presumptive one-third of

the original sentence, with credits, under N.J.S.A. 30:4-123.51(a), "as if the individual had not been subject to a mandatory minimum term." Id. at 8.

"The Directive also establishe[d] protocols to ensure that the modification of inmates' sentences d[id] not create undue public safety risks." Id. at 5. It permitted the prosecutor to seek a discretionary term of parole ineligibility under traditional "grounds that the aggravating factors associated with the defendant's offense of conviction substantially outweigh the mitigating factors," so long as the parole ineligibility term sought did not exceed the mandatory one imposed as part of the original sentence. Id. at 6, 9. If the prosecutor "conclude[d], in consultation with the Director of the Division of Criminal Justice ('DCJ Director'), that the aggravating factors associated with the defendant's offense substantially outweigh the mitigating factors," the prosecutor must nevertheless offer the defendant the opportunity to file a joint motion under the Rule; however, the joint motion would preserve for the prosecutor "the right to argue that, as part of the sentence modification, the court should impose an additional, discretionary period of parole ineligibility, consistent with N.J.S.A. 2C:43-6(b), on the grounds that the aggravating factors associated with the defendant's offense of conviction substantially outweigh the mitigating factors." Id. at 9.

The AG "anticipated" there would be few motions seeking discretionary parole disqualifiers because consultation with the DCJ Director would "ensure

that prosecutors request discretionary parole disqualifiers rarely and in a consistent manner." Id. at 6. In those cases, the only acceptable terms of the joint motion are agreements to reduce the mandatory period of parole ineligibility to a term equal to the presumptive term under N.J.S.A. 30:4-123.51(a), with the prosecutor remaining free to argue for "an additional, discretionary period of parole ineligibility." Id. at 9. Any other sentence modification must be jointly opposed. Ibid.

Section 12 of the CDRA

Challenges to the constitutionality of Section 12 and other provisions of the CDRA began shortly after its enactment. In State v. Lagares, the Court considered the constitutionality of N.J.S.A. 2C:43-6(f), which gave prosecutors unilateral authority to seek a mandatory extended term of imprisonment with a mandatory period of parole ineligibility. 127 N.J. 20 (1992). The Court concluded the statute was unconstitutional as written, and only guidelines to "promote uniformity and provide a means for prosecutors to avoid arbitrary or abusive exercises of discretionary power" could save the statute. Id. at 31–32. The AG issued the so-called Lagares Guidelines to all prosecutors shortly thereafter. See Directive Implementing Guidelines for Determining Whether to Apply For an Extended Term Pursuant to N.J.S.A. 2C:43-6(f) (Apr. 20, 1992).

Against a separation of powers challenge to the prosecutor's sole authority to waive mandatory minimum sentences in plea and post-conviction agreements, the Court in State v. Vasquez upheld the constitutionality of Section 12 by preserving "[j]udicial oversight . . . to protect against arbitrary and capricious prosecutorial decisions." 129 N.J. 189, 196 (1992). The Court held that when resentencing a defendant for a violation of probation (VOP) on an underlying conviction for violating N.J.S.A. 2C:35-7, the school-zone offense mandating a minimum term of imprisonment and minimum period of parole ineligibility, "the Legislature did not intend to require the imposition of a mandatory term of parole ineligibility or to authorize the prosecutor to demand or waive the imposition of a term of parole ineligibility." Id. at 205. In short, the judge was free to impose any legal sentence on the VOP.

After Vasquez, the Attorney General issued plea agreement guidelines that the Court deemed inadequate because of intercounty disparity in their implementation, thereby falling short of the Legislature's intended uniformity in sentencing. State v. Brimage, 153 N.J. 1, 13, 22–23 (1998). To pass constitutional muster, the Court held, "the plea guidelines for N.J.S.A. 2C:35-12 must be consistent throughout the State." Id. at 23.

Following Brimage, in 1998, "Attorney General Peter Verniero issued what became known as the Brimage Guidelines, which had statewide application

and limited the range of available plea offers, specifying more explicitly the permissible bases for upward and downward departures and restricting the factors that can be considered during plea negotiations." Commission Report at 16 (footnote omitted). Six years later, in 2004, Attorney General Peter C. Harvey issued what became known as the Brimage Guidelines 2. See Revised Attorney General Guidelines for Negotiating Cases under N.J.S.A. 2C:35-12 (July 15, 2004).[6] These revised guidelines "came in response . . . to ongoing concerns that the 1998 Guidelines directly contributed to the disproportionate impact of the school zone law on low-level offenders, many of whom were minority residents of New Jersey's inner cities." Commission Report at 16.

II.

Appellants' joint motion to change defendant's sentence in this case proffered four grounds establishing "good cause" to vacate the period of parole ineligibility: (1) the findings from the Commission Report and the Directive concerning inequities wrought by mandatory minimum parole terms for nonviolent drug offenses; (2) the Commission's recommendation to retroactively modify mandatory minimum terms for qualifying offenses; (3) the need for sentencing uniformity required by Brimage by applying the Directive to all

---

[6] Available at https://www.state.nj.us/lps/dcj/agguide/directives/section_1.pdf (last visited Dec. 28, 2021).

current and future defendants whose sentences are subject to modification under Section 12; and (4) the interests of justice.

The judge agreed the motion satisfied the "good cause" threshold of the Rule, finding it would be unfair for the State to waive the mandatory minimum terms for all criminal defendants charged with specified drug offenses prospectively, while at the same time denying defendants serving sentences for the same offenses to benefit from the Directive. However, the judge found "troubling" appellants' and the Directive's reliance on Section 12 to achieve a goal at odds with the overall purpose of the CDRA. Acknowledging that "a plain reading of [Section 12] leaves the door open for cases other than those in which defendants cooperate" with law enforcement, the judge nonetheless found it "simply unreasonable" and "absurd" to permit use of the Directive to thwart "the strong legislative intent to address the pervasive drug crisis pending in society at the time the statute was enacted."

The judge, therefore, found it necessary to consider extrinsic interpretive aids. Relying on legislative history surrounding the CDRA and other sources, she held that resentencing defendant and those similarly situated to eliminate or reduce mandatory minimum parole ineligibility terms under Section 12 would improperly "vitiate the statute." The judge concluded such a change was "clearly the responsibility of the Legislature," to which the Commission directed

its reform recommendations.

The judge said the expressed goal of the CDRA, "incorporated directly into the statute itself" in N.J.S.A. 2C:35-1.1(b) and (c), was "to eradicate the drug problem by imposing severe punishment." Quoting Brimage, 153 N.J. at 9, the judge found the "primary purpose" of Section 12 was twofold: first, "to provide an incentive for defendants[,] especially lower and middle level drug offenders[,] to cooperate with law enforcement agencies in the war against drugs"; second, to unburden the system by encouraging plea bargaining. In addition, the judge referenced the same 1987 legislative committee report regarding Section 12 cited by the Court in Vasquez, 129 N.J. at 198, State v. Bridges, 131 N.J. 402, 408 (1993), and Brimage, 153 N.J. at 9 (citing Assembly Judiciary Comm., Commentary to the Comprehensive Drug Reform Act at 26–27 (Nov. 23, 1987) (Commentary)).

The judge also referenced the 1990 report of the Department of Law and Public Safety, which stated that the CDRA was designed "to encourage prosecutors to offer defendants an attractive option (avoiding . . . an otherwise prescribed period of parole ineligibility) in exchange either for cooperation or else simply in exchange for agreeing to plead guilty, thereby sparing prosecutors and the entire criminal justice system the expense and burdens of trial." Dep't of Law & Pub. Safety, Div. of Crim. Justice, A Law Enforcement Response to

<u>Certain Criticisms of the Comprehensive Drug Reform Act</u>, at 31 (Sept. 17, 1990).  The report added "the Legislature may have found the only means possible to achieve what would ordinarily appear to be two competing if not irreconcilable objectives:  to 'toughen' drug sentences . . . and at the same time increase the percentage of convictions achieved by guilty pleas."  <u>Id.</u> at 32.

The judge determined these sources emphasized the primary purposes of Section 12 were to encourage defendants to cooperate with law enforcement and incentivize guilty pleas.  She concluded the Directive's use of Section 12 and the <u>Rule</u> to change defendant's sentence deviated from the Legislature's intent and constituted a "retroactive abandonment of the mandatory minimum sentences" for drug offenses.

Citing the separation of powers provision of the Constitution, the judge said she was unaware of any case in which a statute was "essentially nullif[ied]" despite the Legislature's clear intent.  Because the Commission "directed the Legislature to make these changes" rather than the Attorney General, the judge found "clearly and convincingly . . . that . . . grant[ing] the parties' petition would lead to an absurd and unreasonable result."

Although observing that denying defendant and similarly situated inmates a retroactive modification of sentence might "result in certain inequities" because future defendants would "reap the benefit" of Section 12 waivers, the

A-3746-20

19

judge determined "this [did] not automatically mandate a different response." The judge concluded that modification of mandatory minimum terms should not occur "until the Commission's proposed changes receive the imprimatur of the Legislature."

## III.

Appellants contend the judge's reasoning misconstrues the plain text of Section 12, which grants broad discretion to the prosecutor, and contains no requirement of "cooperation" by a defendant, nor that the prosecutor demonstrate a direct reduction in burdens on the court system. They argue the judge improperly imposed her interpretation of Section 12's principal purpose over the statute's "clear text."

Appellants further note that although the Brimage Guidelines were intended to advance the twin aims of incentivizing cooperation and reducing the burden on trial courts, the Guidelines require prosecutors to consider numerous factors in negotiating agreements with defendants. See Brimage Guidelines, at 63–66. In short, appellants contend prosecutors have never relied exclusively on a defendant's cooperation or easing of the administrative burden on the courts in exercising discretion under Section 12.

Appellants also note the same Legislature that imposed mandatory minimum terms for certain drug offenses gave "the State . . . expansive statutory

A-3746-20

authority to waive those disqualifiers," recognizing "that broad prosecutorial discretion would . . . mitigate the harsh impacts of the mandatory minimum regime for non-violent drug offenses." They argue that if the Legislature disapproved of the AG's statewide guidelines issued over the past three decades, it could have amended Section 12 at some point, but "the Legislature has never acted to curtail [that] broad delegation of authority."

Amici essentially echo these arguments. The ACLU adds that the Directive's universal waiver policy promotes uniformity in sentencing, the same goal endorsed by the Court in Vasquez, Brimage, and their progeny. The CPA similarly contends that because Section 12 "plainly grants the State . . . the unconditional power to waive a mandatory . . . prison term through either a negotiated plea agreement or post-conviction agreement," consistent with the separation of powers doctrine, the judiciary's only check on the exercise of prosecutorial discretion is whether the prosecutor acted arbitrarily or capriciously. The CPA posits that a joint motion "in harmony with the instructions in and objectives of [the] Directive . . . cannot be characterized as arbitrary or capricious."[7]

---

[7] As noted, defendant was paroled prior to the judge's decision on appellants' joint motion, thereby rendering this appeal moot. See, e.g., Redd v. Bowman, 223 N.J. 87, 104 (2015) ("An issue is 'moot when our decision sought in a matter, when rendered, can have no practical effect on the existing controversy.'"

A.

We review de novo the motion judge's interpretation of the law, including applicable statutory provisions. State v. Nance, 228 N.J. 378, 393 (2017). In construing Section 12, "[o]ur task is to ascertain the Legislature's intent, reflecting its chosen language, and to give the words of the statute 'their generally accepted meaning.'" State v. Bolvito, 217 N.J. 221, 228–29 (2014) (quoting State v. Marquez, 202 N.J. 485, 499 (2010)). "When the Legislature's chosen words lead to one clear and unambiguous result, the interpretive process comes to a close, without the need to consider extrinsic aids." State v. Shelley, 205 N.J. 320, 323 (2011).

"A court 'seek[s] out extrinsic evidence, such as legislative history, for assistance when statutory language yields more than one plausible interpretation.'" State in the Interest of D.M., 238 N.J. 2, 16 (2019) (quoting Shelley, 205 N.J. at 323–24). "We must 'effectuat[e] the legislative plan as it may be gathered from the enactment [when] read in full light of its history,

---

(quoting Deutsche Bank Nat'l Tr. Co. v. Mitchell, 422 N.J Super. 214, 221–22 (App. Div. 2011))); Cinque v. Dep't of Corr., 261 N.J. Super. 242, 244 (App. Div. 1993) (dismissing an inmate's appeal as moot after his release from custody while the appeal was pending). However, courts may decide such cases where the issues "are of substantial importance and are capable of repetition while evading review." Advance Elec. Co. v. Montgomery Twp. Bd. of Educ., 351 N.J. Super. 160, 166 (App. Div. 2002) (citing Mistrick v. Div. of Med. Assistance & Health Servs., 154 N.J. 158, 165 (1998)). This is such a case.

purpose and context.'" <u>Ibid.</u> (alterations in original) (quoting <u>Bolvito</u>, 217 N.J. at 229). "If a question concerns more than one statutory provision, '[r]elated parts of an overall statutory scheme can . . . provide relevant context.'" <u>Id.</u> at 17 (alteration in original) (quoting <u>Beim v. Hulfish</u>, 216 N.J. 484, 498 (2014)).

Similarly, "[b]ecause interpretation of a court rule is a legal issue, our review is de novo." <u>State v. Anthony</u>, 443 N.J. Super. 553, 564 (App. Div. 2016) (citing <u>State v. Tate</u>, 220 N.J. 393, 405 (2015)). Generally speaking, "[t]he approach taken in respect of the construction of court rules is the same as that for the construction of statutes." <u>Ibid.</u> (quoting <u>State v. Clark</u>, 191 N.J. 503, 508 (2007)).

B.

Section 12 provides a sentencing court with only two alternatives "upon conviction": 1) "the court . . . shall impose the mandatory sentence" for the Chapter 35 crime; or, 2) if "the defendant has pleaded guilty pursuant to a negotiated agreement <u>or, in cases resulting in trial, the defendant and the prosecution have entered into a post-conviction agreement</u>, which provides for a lesser period of parole ineligibility," the court "shall not impose a . . . lesser period of parole ineligibility" than called for by the agreement. N.J.S.A. 2C:35-12 (emphasis added).

Appellants argue the statute clearly permits a negotiated post-conviction agreement that obviates the mandatory period of parole ineligibility. However, the State conceded at the hearing on the joint motion that Section 12 could be read to preclude post-conviction agreements for offenders who chose to plead guilty rather than proceed to trial. The State argued, however, that limiting post-conviction agreements to only those defendants who went to trial would be patently inequitable and unfair.

Section 12 also fails to address the court's ability to modify a sentence to enforce a post-conviction agreement <u>after</u> a defendant has begun serving the sentence. While the statute constrains a court's exercise of sentencing discretion with respect to the sentence imposed "upon conviction," it provides no guidance as to the entirely different judicial function regarding motions to change an extant sentence.

With respect to the timing of the agreement and whether post-conviction agreements are limited only to those defendants who went to trial, any ambiguity may be resolved by reference to Section 12's legislative history, specifically, the <u>Commentary</u>. As the motion judge recognized, the Legislature emphasized cooperation with law enforcement was one of Section 12's "key objectives." However, the Committee also clearly stated:

> A <u>post-conviction agreement</u> is also authorized
> by this section, which<u> may be consummated at any time</u>

A-3746-20

24

> after a guilty verdict, including after the imposition of sentence. An offender who is sentenced to prison, for example, could belatedly decide to cooperate with law enforcement. In such event, where the prosecutor consents and joins in the application, and provided that the court does not find that the interest of justice would not be served by effectuating the terms of the post-conviction agreement, the defendant would be entitled to be resentenced by the court to any term which could originally have been imposed pursuant to a negotiated plea agreement.
>
> [Ibid. (emphasis added).]

Moreover, as appellants correctly argue, concluding Section 12 never contemplated post-sentencing modifications, or that every post-sentencing agreement without cooperation undermines Section 12's purpose, is difficult to square with the Brimage Guidelines. As already noted, the Legislature has left undisturbed those guidelines which were implemented to save Section 12 from constitutional infirmity and have been cited with approval by the Court. See, e.g., State v. A.T.C., 239 N.J. 450, 473 (2019). The Guidelines include several potential mitigating factors, other than cooperation with law enforcement, that prosecutors must consider, and which serve to reduce parole ineligibility terms in plea offers and ultimately sentences. See, e.g., Brimage Guidelines 2, § 9, Schedule of Aggravating and Mitigating Factors.

The motion judge's focus on the punitive intent of the CDRA when enacted blurred any recognition that from its inception, the statute provided for

relief from its more draconian provisions through the exercise of prosecutorial and judicial discretion.  Initially, in Section 12, the Legislature provided the prosecutor alone with unfettered discretion.  The Court in Lagares and Brimage did not limit the prosecutor's ability to ameliorate the punitive aspects of the CDRA; it only required that the prosecutor's exercise of discretion be subject to uniform guidelines under the AG's supervision.  In Vasquez, the Court made clear that on post-sentencing violations of probation, the prosecutor no longer had the ability to mandate a sentence under Section 12, and the sentencing decision was one solely for the court.

In addition, the motion judge's focus on the punitive aspects of the CDRA failed to consider another section of the statute, N.J.S.A. 2C:35-14 (Section 14), and the numerous amendments to that provision made by the Legislature since 1987.  When enacted, and notwithstanding the presumption of incarceration for second-degree crimes contained in N.J.S.A. 2C:44-1(d), Section 14 created an exception for certain drug-dependent defendants charged with second-degree CDRA crimes[8] to file a motion, upon notice to the prosecutor, seeking a five-

---

[8]  These were:  N.J.S.A. 2C:35-5 (distribution or possession with intent to distribute); N.J.S.A. 2C:35-6 (employing a juvenile); N.J.S.A. 2C:35-7 (distributing, dispensing, or possessing with intent to distribute near or on school property); N.J.S.A. 2C:35-10 (possession); N.J.S.A. 2C:35-11 (manufacturing, distributing, or possessing imitation CDS with intent to distribute); and N.J.S.A. 2C:35-13 (acquiring or obtaining CDS by fraud).  As of 1999, only those

year probationary term conditioned on entering a drug rehabilitation program, along with "such other reasonable terms and conditions as may be required by the court and by law." L. 1987, c. 106, § 1. The court had discretion to grant such a motion only upon finding "no danger to the community will result and . . . the placement will serve to benefit the defendant by serving to correct his or her dependency on controlled substances." Ibid. As to violations of N.J.S.A. 2C:35-6, 2C:35-7, and offenders previously convicted of N.J.S.A. 2C:35-5, as enacted, the relief was unavailable under subsection (b) "[e]xcept upon the joint application of the defendant and the prosecuting attorney[.]" Ibid.

The Sponsor's Statement explained that the purpose of the CDRA generally was to revise New Jersey's "seriously flawed" current drug laws and sentencing practices "to provide courts with far more precise, consistent and predictable sentencing guidelines." Sponsor's Statement to A. 3270 at 52, 55 (Feb. 5, 1987). The Assembly Judiciary Committee Statement explained the purpose of Section 14 was to "provide for rehabilitative treatment as an alternative to incarceration in appropriate cases" under "carefully prescribed" standards. A. Judiciary Comm. Statement to A. 3270 at 4 (Dec. 18, 1986). In a signing statement, Governor Kean said the bill was designed to revise the drug

charged with N.J.S.A. 2C:35-7 remain potentially eligible under the statute. L. 1999, c. 376, §2.

27

laws for the twin aims of "crack[ing] down on those who deal in this despicable business," while "provid[ing] help for those who have been hooked and become dependent on narcotics." Governor's Signing Statement to A. 3270 at 2 (Apr. 23, 1987).

Twelve years later, the Legislature amended Section 14. See L. 1999, c. 376, § 2. We need not detail all the changes. The Sponsor's Statement said the amendments were "designed to break the cycle of crime and addiction by authorizing courts to compel drug and alcohol dependent persons to submit to the rigors of treatment," and were based on the recommendations contained within the 1996 Report to the Governor by the Attorney General on the Need to Update the Comprehensive Drug Reform Act of 1987 (Dec. 9, 1996) (Verniero Report).[9] Sponsor's Statement to S. 1253 at 14 (June 22, 1998).

In the prefatory letter to the report on which the amendments were based, Attorney General Verniero said the genesis of the report was the Governor's request "to consult with drug enforcement and prosecution experts and to recommend how best to update and revise the [CDRA]." Letter from Attorney General Peter Verniero to Governor Christine Todd Whitman (Dec. 9, 1996). The Verniero Report recommended amending Section 14 to "increase[ ] and

---

[9]Available online at https://dspace.njstatelib.org/xmlui/bitstream/handle/10929/29229/n2221996i.pdf?sequence=1&isAllowed=y (last visited Dec. 28, 2021).

enhance[ ] in appropriate cases" the "use of court-ordered treatment as a sentencing alternative." Verniero Report, at iii.  Whereas, when the CDRA was enacted in 1987, "there was comparatively little information about the efficacy of treatment and about how to improve the chances for rehabilitation," id. at 18, since then, "[n]ew empirical research" had shown "clearly the efficacy of drug rehabilitation treatment and the need to use the criminal justice system to mandate or 'leverage' nonviolent offenders into treatment . . . [to] address their needs before they . . . resort to violence." Id. at 3.

The Legislature again amended Section 14 in 2008.  L. 2008, c. 15, § 1. Subsection (a) was amended to permit "[a]ny person . . . ineligible for probation due to a conviction for a crime which is subject to a presumption of incarceration or a mandatory minimum period of parole ineligibility" to "be sentenced to a term of special probation." L. 2008, c. 15, § 1 (emphasis added).

The Legislature recognized that the 2008 amendments were "substantially similar to the bill recommended by the New Jersey Commission to Review Criminal Sentencing (CRCS) in its report." S. Judiciary Comm. Statement to S. 233/S. 504 at 2 (Jan. 24, 2008).  The CRCS Report, in turn, recognized the efficacy of New Jersey's burgeoning Drug Court program.  See "New Jersey's Drug Courts, Special Probation and Proposal for Reform," April 2007 at 6

A-3746-20

29

(CRCS Report);[10] see also State v. Meyer, 192 N.J. 421, 428–29 (2007) (discussing success of Drug Courts). Like the Commission Report issued twelve years later, the CRCS Report highlighted the punitive, racially disparate impacts of the CDRA, noting that "New Jersey imprison[ed] the highest percentage of drug offenders in the country," and that "[seventy-three percent] of those imprisoned drug offenders were African Americans." Id. at 25.

The Legislature made additional changes to Section 14 in 2012, and the legislative history of those amendments discloses an intent to provide judges with "greater discretion to place the person on special probation even if one or more of the enumerated discretionary factors [were] not met." S. Budget & Approp. Comm. Statement to S. 881 at 1–2 (Apr. 3, 2012). Similarly, the statement noted that eliminating the prosecutor's ability to veto a probationary sentence, subject only to review for a gross and patent abuse of discretion, see, e.g., State v. Hester, 357 N.J. Super. 428, 441 (App. Div. 2003), would "provide the court greater discretion to make a determination of program eligibility." S. Budget & Approp. Comm. Statement to S. 811 at 2.

We acknowledge that even after further amendments, the current iteration of Section 14 maintains ineligibility for special probation for all convicted of

---

[10] Available online at https://www.njleg.state.nj.us/OPI/Reports_to_the_ Legislature/sentencingcommission_drug_courts_2007.pdf (last visited Dec. 28, 2021).

Chapter 35 crimes "for which a mandatory minimum period of incarceration is prescribed," except school zone offenses (N.J.S.A. 2C:35-7). N.J.S.A. 2C:35-14(b)(3). Nevertheless, Section 14 was part of the CDRA when enacted and evinced the Legislature's purposeful counterbalance to the punitive provisions elsewhere in the statute. Over the ensuing years, the universe of eligibility for probationary sentences has expanded, with the Legislature explaining the changes were intended, among other things, to address racial disparities in incarceration rates that directly resulted from the CDRA's mandatory minimum provisions.

The failure to consider Section 14 as part of the CDRA undercuts the motion judge's reliance on other parts of the statutory scheme to conclude the Directive was an "absurd" interpretation of the Legislature's intent. Rather, the history of legislative amendments to Section 14, often after careful study and analysis by various actors in the criminal justice system, demonstrates an intent to reduce incarceration rates for certain Chapter 35 offenders, consistent with the stated purposes of the Directive.

In short, the motion judge misconstrued the authority of the State to enter into post-conviction agreements with defendants under the CDRA to modify mandatory parole ineligibility periods. Her conclusion that the CDRA generally limited such post-conviction agreements to situations in which a defendant

cooperated with law enforcement reflected a crabbed interpretation of the power the Legislature bestowed upon prosecutors in Section 12 and was inconsistent with the actual text as subsequently interpreted by the Court. And, the judge's focus on the punitive aspects of the CDRA, evident in statements made by the Legislature when the statute was enacted decades ago, accorded greater import to punishment of drug offenders through mandatory periods of incarceration than subsequent statements of legislative intent that question those original 1987 policy judgments.

## C.

We acknowledge that "[a]s the State's chief law enforcement officer, the Attorney General has broad authority over criminal justice matters that derives from several sources." In re Att'y Gen. Law Enf't Dir. Nos. 2020-5 and 2020-6, 246 N.J. 462, 482–83 (2021). If nothing else, however, our prior discussion demonstrates the unfettered exercise of prosecutorial discretion in sentencing, even when acquiesced to by a defendant, is not immune from judicial review. See Lagares, 127 N.J. at 27–28 ("Although sentencing discretion is shared to some extent among the three branches of government, the determination of the sentence is committed to the discretion of the judiciary."); see also R. 3:21-10(a) (permitting the court "on its own initiative" to reduce or modify a sentence). We turn our attention, therefore, to the Rule, and questions of first impression, i.e.,

what is good cause for modifying a sentence upon joint application of the State and a defendant, and what standard of review applies in reviewing the motion court's decision?

As to the latter, our courts have employed a discretionary standard of review to motions made under other subsections of <u>Rule</u> 3:21-10(b), which permit a court to change a sentence at any time for reasons other than on joint application of the prosecutor and the defendant. <u>See, e.g.</u>, <u>State v. Davis</u>, 68 N.J. 69, 85 (1975) (applying abuse of discretion standard to trial judge's decision on the defendant's request for transfer to a substance abuse program pursuant to subsection (b)(1)); <u>State v. Chavies</u>, 247 N.J. 245, 260 (2021) (considering modification under subsection (b)(2) based on the defendant's medical condition, stating, "As with sentencing, the scope of appellate review of a trial court's decision to grant or deny a <u>Rule</u> 3:21-10(b)(2) motion is whether the trial court abused its discretion." (quoting <u>State v. Priester</u>, 99 N.J. 123, 137 (1985))). "A court abuses its discretion when its 'decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" <u>Chavies</u>, 247 N.J. at 257 (quoting <u>State v. R.Y.</u>, 242 N.J. 48, 65 (2020)). We see no principled reason why a different standard of appellate review should apply to decisions made by trial courts on joint motions to change a sentence pursuant to the <u>Rule</u>.

We note, however, that our courts have routinely rejected motions for change of sentence if the defendant was still serving a <u>mandatory</u> period of parole ineligibility. <u>See, e.g.</u>, <u>Chavies</u>, 247 N.J. at 260 (2021) (holding a defendant may not file the motion under (b)(2) while serving a mandatory, minimum sentence under the No Early Release Act); <u>State v. Mendel</u>, 212 N.J. Super. 110, 113–14 (App. Div. 1986) (holding a defendant may not file the motion under (b)(1) during a mandatory period of parole ineligibility under the Graves Act).

The situation here is obviously different in two respects. First, because the prosecutor may exercise post-conviction discretion under Section 12 to modify the statutory minimum term of a Chapter 35 offense, the period of parole ineligibility is no longer "mandatory" in the truest sense. <u>See</u> <u>State v. Shaw</u>, 131 N.J. 1, 9 (1993) ("Because the prosecutor can thus waive the parole disqualifier, section [N.J.S.A. 2C:35-]7's sentencing is not mandatory 'at least in the typical or conventional use of mandatory sentencing.'" (quoting <u>Vasquez</u>, 129 N.J. at 199)); <u>State v. Peters</u>, 129 N.J. 210, 219 (1992) (holding in the context of a VOP that "[N.J.S.A. 2C:35-]7's parole disqualifier is a conditional, not a mandatory, sentence. Once the prosecutor waives the parole disqualifier at the original sentencing, and that sentence has been served, it is no longer mandatory in future

proceedings.").[11]  Second, and decidedly more importantly, subsection (b)(3) requires the State's participation in the application for modification of the sentence.

The more difficult issue is whether a particular joint motion establishes "good cause," a term left undefined by the Rule, for sentence modification.  See Pressler & Verniero, Current N.J. Court Rules, cmt. 2.3 on R. 3:21-10 (2022) (noting the "provision does not undertake to either define or to illustrate 'good cause' in this context," but suggesting an appropriate situation may be a defendant's cooperation with law enforcement after the time limit in Rule 3:21-10(a), sixty days after conviction, expired)  (citing Report of the Committee on Criminal Practice, 98 N.J.L.J. Index Pg. 344 (1975)).

We have construed the phrase "good cause" on several occasions, utilizing similar standards.  See, e.g., Ghandi v. Cespedes, 390 N.J. Super. 193, 196 (App.

---

[11]  In State v. Diggs, we held that a defendant serving a period of parole ineligibility under N.J.S.A. 2C:35-7 was not entitled to a change of sentence to enter a drug program.  333 N.J. Super. 7, 9–11 (App. Div. 2000).  And, in State v. McPhall, both the defendants moved for a change of sentence and admission into the Intensive Supervision Program (ISP) under Rule 3:21-10(b)(6).  270 N.J. Super. 454, 456 (App. Div. 1994).  We reversed the trial court's orders permitting entry into the program because both the defendants were serving periods of incarceration for the CDRA violations pursuant to negotiated agreements under Section 12, and there was "no legislative authority permitting a mandatory period of incarceration to be vitiated by diversion into ISP."  Ibid. As neither case involved a prosecutorial waiver of parole ineligibility under section 12 or a joint application for a change of sentence under Rule 3:21-10(b)(3), they do not figure into our analysis.

Div. 2007) (explaining that "'[g]ood cause' is an amorphous term, that is, it 'is difficult of precise delineation.  Its application requires the exercise of sound discretion in light of the facts and circumstances of the particular case considered in the context of the purposes of the Court Rule being applied'" (quoting Del. Valley Wholesale Florist, Inc. v. Addalia, 349 N.J. Super. 228, 232 (App. Div. 2002))).  In Estate of Lagano v. Bergen County Prosecutor's Office, we applied similar reasoning in deciding whether there was good cause under a statute, section 17(c) of the Wiretap Act, to disclose the contents of intercepted communications.  454 N.J. Super. 59, 79–80 (App. Div. 2018).  We noted that "[a] trial court's determination of 'good cause' . . . involves weighing the need for disclosure against the harm disclosure is likely to cause."  Id. at 80.

Considering the phrase in the context of criminal proceedings has been a less common occurrence.  In State v. Szemple, the Court considered whether the defendant established "good cause" for post-conviction discovery, under State v. Marshall, 148 N.J. 89, 270 (1997).  247 N.J. 82, 107–08 (2021).  The Court concluded the defendant's delay in seeking the information, without explanation and without any proof it would "cast doubt on the jury's verdict" did not outweigh "the competing interests of finality and fundamental fairness."  Id. at 111.

Courts have found "good cause" to interview jurors about deliberations in

a case pursuant to Rule 1:16-1, when there was "some event or occurrence . . . injected into the deliberation in which the capacity for prejudice inheres." State v. Loftin, 146 N.J. 295, 381 (1996) (quoting Pressler, Current N.J. Court Rules, cmt. 1 on R. 1:16-1 (1996)). We have held the purpose of that "rule [was] to 'accommodate the public interest both in maintaining the secrecy of jury deliberations and in avoiding gross injustice by permitting inquiry into the events surrounding the jury's decision only where' a showing is made 'that misconduct occurred which tainted the verdict.'" State v. R.D., 345 N.J. Super. 400, 405 (App. Div. 2001) (quoting Pressler, Current N.J. Court Rules, cmt. 1 on R. 1:16-1 (2002)).

Our decision in State v. Johnson presents facts that are most similar to this appeal, in that it involved our review of the resentencing of the defendant, not under a court rule, but rather a statute that employed the good cause standard. 176 N.J. Super. 1 (App. Div. 1980). In Johnson, the defendant was convicted of various crimes and sentenced before enactment of the current Criminal Code in 1979 to a thirty-three-year indeterminate term at the Adult Diagnostic and Treatment Center. Id. at 3–4. Pursuant to N.J.S.A. 2C:1-1(d)(2), defendants became eligible "for the reduction or modification 'for good cause shown' of sentences of imprisonment imposed prior to the Code's effective date for offenses which are eliminated or downgraded in the code." Id. at 2. The

specially designated three-judge panel which heard all such motions concluded the defendant was entitled to resentencing and reduced his sentence. Id. at 4–5.

The State appealed, and the defendant contended he had a "statutory right to a resentence because the maximum terms of imprisonment for the Title 2A crimes . . . exceed[ed] the maximum terms of imprisonment for the equivalent crimes under the code. According to this argument, disparity in sentence is sufficient good cause to meet the statutory prerequisite." Id. at 7. We rejected that argument, stating:

> We need not delineate precisely the bounds of good cause. Obviously the aggravating and mitigating factors to be taken into consideration in original sentencing . . . should be weighed. A persistent offender, as defendant has been, may be subject . . . to a sentence to an extended term of imprisonment beyond the maximum in the code. The most relevant factors in the determination of good cause should bear on any past criminal record, the nature and circumstances of the crime for which resentencing is applied for, its violence, heinousness or depravity, any parole violations, and the risk that the applicant for resentencing will commit another crime, in particular if the result of resentencing is that his release from imprisonment is advanced to an early future date. These criteria are negative, tending to rebut good cause without which a resentence may not be granted under N.J.S.A. 2C:1-1[(d)](2).
>
> [Id. at 8.]

In this case, appellants have posited that this and every defendant for whom a joint application has been filed established prima facie grounds for

resentencing under the <u>Rule</u>. They argue that the <u>Commission Report</u>'s findings of mass incarceration and pernicious racial disparity in sentencing, also recognized by the Directive, are sufficient to grant relief in every instance. Before us, the Assistant Attorney General asserted the court's decision-making authority only came into play in those rare instances where, pursuant to the Directive, there was disagreement over whether a discretionary minimum term of parole ineligibility should apply instead of the previously imposed term. We reject those arguments.

It is evident from our discussion that regardless of the particular context, any determination of good cause demands the court's considered judgment, not some rubber stamp. In <u>State v. Tuminello</u>, the Court provided "a word of guidance" regarding resentencing under <u>Rule</u> 3:21-10(b)(2), permitting a change in sentence to release a defendant from custody based on poor health. 70 N.J. 187, 194 (1976). Although the rule "contain[ed] no specific command that the court set forth its reasons" as does the rule "governing the original imposition of sentence," <u>see</u> <u>Rule</u> 3:21-4(h),

> At least some of the underlying policy considerations which favor the furnishing of reasons on sentencing are equally applicable to a change of sentence: to provide an appellate court with the means by which to review a decision on sentencing; and to contribute to uniformity of sentencing.
>
> [<u>Ibid.</u>]

A-3746-20

We do not believe the Court expected that the decisions judges would make on joint motions brought under the Rule required no more than rote recitation of policy judgments made by others.

Good cause under the Rule brings into focus the tension between different animating purposes of sentencing in our criminal justice system: finality, sentence uniformity and public safety on one hand; a sentence that considers individual circumstances as to offender and offense on the other. State v. Randolph, 210 N.J. 330, 349 (2012) ("Defendant is entitled to that individualized consideration during sentencing. In a resentencing, a defendant similarly is entitled to the same full review and explanation of the finding and weighing of aggravating and mitigating factors."). As we said in other circumstances, specifically whether there was good cause to delay prosecution of a defendant who invoked his rights under the Interstate Agreement on Detainers, N.J.S.A. 2A:159A-3(a), "whether good cause exists . . . must be resolved from a consideration of the totality of circumstances in [a] particular case." State v. Buhl, 269 N.J. Super. 344, 356 (App. Div. 1994) (alteration in original) (citations omitted).

Moving forward, in considering joint motions filed pursuant to the Directive and under the aegis of the Rule, the judge must make individualized determinations of whether good cause exists for the requested relief. The factors

we set out in <u>Johnson</u>, 176 N.J. Super. at 8, are a good starting point, but by no means do they close the field to further inquiry by the judge.

We reverse and vacate the order under review.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3746-20

41